## IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY

| | | |
|---|---|---|
| Levita Simmons, Administrator of the Estate of Arthur Scott, and Jeffrey Orvis, Executor of the Estate of James Orvis | ) ) ) ) | Case No. |
| | ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | |
| Tyson Foods, Inc., doing business as Tyson Pet Products, and Tyson Fresh Meats Group, a wholly owned subsidiary of Tyson Foods, Inc., John H. Tyson, Noel W. White, Dean Banks, Steven R. Stouffer, Tom Brower, Mary A. Oleksink, Elizabeth Croston, Scott Walston, David Scott, Tom Hart, Cody Brustkern, John Casey, Bret Tapken, Hamdija Beganovic, Ramiz Mujelic, and Unknown Plant Managers and Supervisors at Tyson Waterloo Plant and Unknown Plant Managers and Supervisors at Tyson Independence Plant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PETITION AND JURY TRIAL DEMAND** |
| *Defendants.* | | |

## <u>COMPLAINT</u>

Plaintiff Levita Simmons, Administrator of the Estate of Arthur Scott, and

Plaintiff Jeffrey Orvis, Successor in Interest to Estate of James Orvis, by and

through their undersigned attorneys, bring this complaint seeking monetary

damages against Defendant Tyson Foods, Inc., doing business as Tyson Pet

Products, Tyson Fresh Meats Group, John H. Tyson, Noel W. White, Dean Banks,

Steven R. Stouffer, Tom Brower, Mary A. Oleksink, Elizabeth Croston, Scott

Walston, David Scott, Tom Hart, Hamdija Beganovic, Ramiz Mujelic, and Unknown

Plant Managers and Supervisors at Tyson Waterloo Plant and Unknown Plant Managers and Supervisors at Tyson Independence Plant:

## INTRODUCTION

1.　　The global pandemic caused by the novel coronavirus COVID-19 has engulfed the United States. The workers who keep America's animal factories running have suffered as a result of the coronavirus pandemic in ways that few other people have—the calamitous consequences have included sickness and death for many hard-working people.

2.　　Many of America's factory farm workers are low-income, lack specialized skills, and enjoy few, if any, job prospects besides working at the local factory farm. They work very hard over long hours, receive low pay, and perform physically grueling and emotionally devastating work, all to keep the nation's supply of meat steady and affordable.

3.　　The factory farms that employ these farm workers have been deemed "essential" and have stayed open.

4.　　Many plant workers have never received adequate sick leave, other paid time off, or protections from being summarily fired.

5.　　These workers are thus forced to continue working, even if sick, in order to avoid being fired.

6.　　This puts all of the workers at risk. That risk is exacerbated because the plants are unmitigated breeding grounds for coronavirus, where employees lack

personal protective equipment, work elbow to elbow, and in conditions that include inconsistent cleaning and sanitation.

7.     Tyson Foods, Inc. (Tyson) is a behemoth in the animal agriculture industry. Its annual revenue in 2019 was $43 billion. It produces meat for human consumption, as well as dog food and dog treats.

8.     Despite its vast wealth and resources, Tyson Foods, Inc., operating through two of its subsidiaries in Iowa, has chosen to let workers get sick and die, rather than take proper steps to ensure a safe workplace.

9.     Placing profits above people, Tyson enjoys the financial benefits of being deemed  an "essential" business but has not followed the clear health and safety guidelines for protecting essential workers by the Centers for Disease Control and Prevention ("CDC") and the Occupational Health and Safety Administration ("OSHA").

10.     The consequences of Tyson's failure to protect its workers has been dire: COVID-19 has spread at its Waterloo and Independence plants to employees, as well as to the people they live with and the communities at large, causing serious illness and multiple deaths. Had the business implemented appropriate preventative measures, those harms would have been greatly reduced.

11.     Tragically, the fates of Tyson's employees, as well as numerous Iowans living in the vicinity of these two plants, was largely preventable. Defendants ignored clear evidence that their employees were at serious risk of catching a

serious disease, COVID-19, instead of putting basic health and safety measures in place to protect them.

12.     Plaintiffs bring this action for injunctive relief to require Tyson, through two of its subsidiaries, to follow CDC and OSHA guidelines and keep its workers safe. They also seek monetary relief to redress the harms that they have suffered and will continue to suffer in the future.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the Defendants because a substantial portion of the acts and omissions giving rise to the Plaintiffs' claims occurred in Black Hawk County, Iowa.

14.     Plaintiffs certify, pursuant to IA Code § 619.18, that this action meets applicable jurisdictional requirements for amount in controversy.

15.     Venue is proper under IA Code § 616.18 because more than one Defendant resides in Black Hawk County.

## PARTIES

### A.     The Named Plaintiffs

16.     Plaintiff Levita Simmons is the Administrator of the Estate of Arthur Simmons. Mr. Simmons was a 51-year-old father and employee of Tyson. He worked at the Tyson Pet Products Plant in Independence, Iowa, which makes dog treats. Mr. Simmons died on April 23, 2020 of COVID-19.

17.     Plaintiff Jeffrey Orvis is the Executor of the Estate of his brother, James Orvis. James worked in the laundry room at the Tyson Plant in

Independence, Iowa, which processes pork. Mr. Orvis died on April 19, 2020 of COVID-19.

**B.    The Defendants**

18.    Defendant Tyson Foods, Inc. ("Tyson") is a Delaware corporation with its principal place of business in Arkansas.

19.    Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats") is a wholly owned subsidiary of Tyson Foods, Inc., also incorporated in Delaware. It operates a pork processing facility in Waterloo, Iowa.

20.    Defendant Tyson Pet Products is a wholly owned subsidiary of Tyson Foods, Inc. It is a Delaware corporation with its principal place of business in Arkansas. Tyson Pet Products manufactures dog food treats at its Independence, Iowa plant under the brand name "True Chews."

21.    Defendant John H. Tyson is the Chair of Tyson Foods, Inc.

22.    Defendant Noel W. White is the Chief Executive Officer of Tyson Foods, Inc.

23.    Defendant Dean Banks is the President of Tyson Foods, Inc.

24.    Defendant Steven R. Stouffer is the President of Tyson Fresh Meats, Inc.

25.    Defendant Tom Brower is the Senior Vice President of Health and Safety of Tyson Foods, Inc.

26.    Defendant Mary A. Oleksink is the Chief Human Resources Officer of Tyson Foods, Inc.

27.     Defendant Elizabeth Cranston is the Executive Communications Manager for Tyson Fresh Meats.

28.     On information and belief, Scott Walston was the Plant Manager of the Independence plant at all relevant times prior to and during the period when decedents Arthur Lee Scott and James Orvis contracted coronavirus and sustained their fatal injuries. On information and belief, David Scott was and/or is Plant Manager of the Independence plant and was the successor to Scott Walston.

29.     Defendant Tom Hart is the Plant Manager of the Tyson Waterloo Plant.

30.     Defendant Cody Brustkern and John Casey hold and/or held at all relevant times upper-level management positions at the Tyson Waterloo Plant. They are required to identify potential safety hazards and be familiar with all aspects of the Waterloo Plant.

31.     Defendant Bret Tapken is the Safety Lead of Tyson Waterloo Facility. He is required to identify potential safety hazards and be familiar with all aspects of the Waterloo Plant.

32.     Defendant Hamdija Beganovic is the Supervisor of the Tyson Waterloo Plant.

33.     Defendant Ramiz Muheljic is a general supervisor at the Tyson Waterloo Plant.

34.     Defendants Hart, Brustkern, Tapken, Beganovic, Muheljic were based out of the Waterloo Plant.

35.     Defendants Unknown Plant Managers and Supervisors of the Tyson Waterloo Plant are employees of Tyson and Tyson Fresh Meats who operate in a supervisory or managerial capacity at the Tyson Waterloo Plant.

36.     Defendants Unknown Plant Managers and Supervisors of the Tyson Independence Plant are employees of Tyson and Tyson Pet Products who operate in a supervisory or managerial capacity at the Tyson Independence Plant.

## FACTS

### A.     A Health Pandemic Engulfs the Nation

37.      In January 2020, a deadly coronavirus causing the disease COVID-19 began spreading throughout the world, killing more people than any other viral outbreak has for decades.

38.     The United States had its first confirmed case of COVID-19 on January 21. The rate of confirmed cases grew rapidly after that, as the virus spread through cities, towns, and rural areas throughout the country. According to data compiled by the CDC, the United States now has more than 27.6 million confirmed cases and has incurred more than 489,000 deaths, thus far.[1]

39.     The virus is highly contagious. A single person may be able to spread it to 5 or 6 other people.[2] It is an airborne illness that spreads mainly from person-to-person contact, particularly between people who stand within 6 feet of each other. Coronavirus travels through respiratory droplets produced when an infected person coughs or sneezes, but it can also spread via smaller droplets emitted just by talking

---

[1] https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days
[2] https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article?deliveryName=USCDC_333-DM25287

or breathing. These droplets can land in the mouths or noses of people who are nearby. COVID-19 can be transmitted from people who are not showing symptoms.

40.    The coronavirus can remain in the air for up to three hours after a person emits it. Another person can breathe in the virus in the air particles and become infected.

41.    COVID-19 is associated with an array of symptoms. On one hand, some infected people have no symptoms at all. On the other hand, infected people can display symptoms associated with common illnesses such as fever, body ache, dry cough, fatigue, chills, headache, and sore throat. More severe symptoms include shortness of breath, high fever, and severe cough. People infected by coronavirus may also experience neurological symptoms (such as dizziness, confusion, and seizures) and gastrointestinal symptoms (such as vomiting and diarrhea).

42.    Individuals who have been infected by the coronavirus may have mild symptoms for several days or a week and then worsen rapidly. In other words, even asymptomatic individuals can pose a health risk.

43.    To stem the spread of the virus, public health experts cautioned the public to stay home whenever possible and to follow "social distancing" protocols by avoiding public spaces and groups and staying at least 6 feet away from others. When exposure to others must occur, health experts recommended wearing masks, frequently washing hands, not touching one's own eyes, nose, or mouth prior to washing hands, maintaining physical distance, and other practices.

44.     These experts warned that failing to stay home on a large-scale basis would allow the virus to spread unchecked, such that the number of confirmed cases at any one time would overwhelm the hospital system and existing public health infrastructure.

**B.     COVID-19 Spreads Through Iowa**

45.      At the same time as the United States reported its first case of COVID-19 on January 21, 2020, the United States Department of Health and Human Services declared a national public health emergency.

46.     On March 8, 2020, three COVID-19 cases were reported in Iowa.

47.     On March 9, 2020, Iowa Governor Kim Reynolds issued a Proclamation of Disaster Emergency in response to the COVID-19 outbreak.

48.     On March 11, 2020, the World Health Organization (WHO) declared the COVID-19 outbreak a global pandemic.

<u>49</u>.     Two days later, on March 13, 2020, President Donald Trump declared a National Emergency in response to the COVID-19 outbreak.

50.     Around the same time, on or about March 13, 2020, Tyson suspended all United States commercial business travel, forbid all non-essential visitors from entering Tyson's offices and facilities, and mandated that all non-critical employees at its U.S. corporate office locations work remotely.

51.     Just a few days later, on March 17, 2020, Governor Reynolds declared a State of Public Health Disaster Emergency for the State of Iowa. President Trump approved a disaster declaration for Iowa on March 24, 2020.

### C.    CDC Issues Guidelines To Reduce The Risk of Exposure to Coronavirus

52.    On February 4, 2020, the CDC issued guidelines for employers and employees regarding the COVID-19 pandemic, disseminating the public health protocols that should be followed to stop the spread of the virus.[3] That guidance was updated on March 21, 2020.

53.    The purpose of the CDC guidance was to "help prevent workplace exposures to COVID-19 in nonhealthcare settings" and to "provide[] planning considerations for community spread of COVID 19."

54.    Among other guidance, the CDC provided that:

> i.  Employees who have symptoms should stay home and employers should develop flexible leave policies to allow employees to stay home, particularly by creating non-punitive sick leave policies;
>
> ii.  Employers should not require a positive COVID-19 test or a healthcare provider's note for employees to take a sick leave;
>
> iii.  Sick employees should not return to work except in consultation with independent health care providers and state and local health departments;
>
> iv.  Employers should reduce face-to-face contact between employees;
>
> v.  Employers should take steps to reduce transmission at the workplace by reassigning work tasks to maintain a social distance of six feet, staggering shifts, or allowing telework;
>
> vi.  Employers should establish policies to minimize spread through a workplace by using contact-tracing and testing to identify workers who have likely been exposed to the disease and quarantining infected workers;

---

[3] https://www.cdc.gov/mmwr/volumes/69/wr/mm6905e1.htm

    vii.  Employees should be encouraged to wash their hands and employers should facilitate this by providing hand washing stations;

    viii.  Employers should increase ventilation rates; and

    ix.  Employers should develop plans to clean high-touch areas with an EPA-approved cleaning agent.

55.    The CDC advised against gatherings of more than 10 people. It also warned of "community spread" where the virus spreads easily and sustainably within the community.

56.    On March 9, 2020, OSHA released guidance relating to safety in factories. That guidance said that employers should offer surgical masks or respirators to workers who could be exposed, especially workers who have to work within 6 feet of each other.

## D.    Slaughterhouses and Meat Processing Facilities Are Breeding Grounds for COVID-19

57.    The working conditions inside factory farms accelerate the spread of airborne viruses like the novel coronavirus and leave workers particularly vulnerable to contracting COVID-19.

58.    As the CDC recognized, the work environment for meat and poultry processing workers, particularly in processing lines and other busy areas of the plant, "contribute substantially" to the workers' potential exposures to COVID-19. This is for several reasons, including that:

    i.  Meat and poultry processing workers usually stand "elbow-to-elbow" with no partition or other way to shield themselves from each other's emissions of an airborne virus.

ii. Workers are near each other in communal areas, such as when clocking in or out, during breaks, or in locker rooms.

iii. Shifts are long (*e.g.*, 10-12 hours per shift) and require prolonged closeness to coworkers.

iv. Many plants are not well-ventilated, raising the likelihood of exposure to a coworker's COVID-19.

v. Plants focus on sanitizing the floors and other points of contact with the animal product but do not adequately sanitize the areas with which workers come into contact. Workers are exposed to coronavirus because they must interact with potentially contaminated surfaces or objects, such as machines, tools, other equipment, workstations, or breakroom tables.

59. In addition, meat processing companies, including Defendants, have been speeding up production lines so that more meat can be processed at the plant in the same amount of time. But faster lines require more workers in the same amount of space, causing workers to have to stand closer together.

60. Moreover, to accommodate the faster processing speed, workers have less time to practice necessary hygiene practices, such as washing their hands regularly. Defendants used faster line speeds to increase production and profits by knowingly sacrificing employees' health and safety.

61. The CDC also recognized additional factors that increase the risk of contracting the coronavirus among meat and poultry processing workers, including:

i. sharing transportation such as ride-share vans or shuttle vehicles to/from the plants; and

ii. frequent contact with fellow workers in community settings in areas where there is ongoing community transmission.

62.     The heightened risks created by these unique work environments, coupled with certain plants' failures to implement necessary or adequate safety protocols to minimize the virus' spread, meant that these plants became hotbeds of COVID-19.

63.     Indeed, as of September 7, 2020, the United Food and Commercial Workers International Union estimated that 29,000 meatpacking and food processing workers have been impacted by the virus, meaning they have tested positive for COVID-19, missed work due to self-quarantine, are awaiting test results, or have been hospitalized, and/or are symptomatic. It has confirmed 238 worker deaths in meatpacking and food processing.

**E.     Tyson's Employees Deemed Part of the "Essential Critical Infrastructure Workforce" that Required Serious Protections From COVID-19**

64.     Given that food processing plants present a particularly dangerous work environment, the health and safety of Tyson's workers depended on the company adhering to CDC and OSHA guidelines.

65.      On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency issued guidance identifying various businesses and industries that were considered "essential businesses." Those who worked at essential businesses were part of the "essential critical infrastructure workforce."

66.     Employees at animal slaughter and processing facilities were among the "critical infrastructure" workforce. The federal guidance referenced to them as:

- Food manufacturer employees and their supplier employees—to include those employed in food processing (packers, meat processing, cheese plants, milk plants, produce, etc.) facilities; livestock, poultry, and seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging

- Farm workers to include those employed in animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically

67. Because these workers were considered "critical" to the nation's health and safety during the COVID-19 crisis, the federal guidance made clear "as the nation relies on these workers…, they must be protected from exposure to and infection with the virus so that they can continue to carry out their responsibilities."

68. Accordingly, the federal guidance advised employers of the following "key principles":

i. Employers "must" comply with Occupational Safety and Health Administration (OSHA) requirements for protecting critical infrastructure workers who remain on or return to the job during the COVID-19 pandemic;

ii. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not limited to, physically separating staff, staggering work shift hours or days, and other social distancing measures. While the CDC recommends that everyone wear a cloth face cover to contain respiratory droplets when around others, critical infrastructure employers must consider how best to implement this public health recommendation for source control in the workplace. For example, employers may provide disposable facemasks (*e.g.*, surgical masks) instead of cloth face coverings when workers would need to wear masks for extended periods of time (*e.g.*, the duration of a work shift) or while performing tasks in which the face covering could become contaminated; and

iii. Employers must consider the impact of workplace sick leave policies that may contribute to an employee decision to delay reporting medical symptoms. Sick

employees should not return to the workplace until they meet the criteria to stop home isolation.

69.     The CDC then promulgated guidelines specifically addressing meat and poultry workers.[4] These guidelines memorialized the very same precautions it had provided one month earlier.

70.     For instance, it advised plants to, at a minimum, place their workers at least six feet apart:



_____

[4] https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html

71.     Plants should also implement "appropriate cleaning, sanitation, and disinfection practices to reduce exposure or shield workers."

72.     The CDC also recommended:

> i. Consulting with a heating, ventilation, and air conditioning engineer to ensure adequate ventilation in work areas to help minimize workers' potential exposures;
> taking steps to minimize air from any fans blowing from one worker directly at another worker. Personal cooling fans should be removed from the workplace to reduce the potential spread of any airborne or aerosolized viruses.  If fans are removed, employers should remain aware of, and take steps to prevent, heat hazards.
> ii. Placing handwashing stations or hand sanitizers with at least 60% alcohol in multiple locations to encourage hand hygiene.
> iii. Adding additional clock in/out stations, if possible, that are spaced apart, to reduce crowding in these areas. Consider alternatives such as touch-free methods or staggering times for workers to clock in/out.
> iv. Removing or rearranging chairs and tables, or adding partitions to tables, in break rooms and other areas workers may frequent to increase worker separation
> v. Identifying alternative areas to accommodate overflow volume such as training and conference rooms, or using outside tents for break and lunch areas.

73.     At the Waterloo and Independence plants, Defendants followed none of these guidelines. At most, they implemented superficial measures that did not actually protect anyone from COVID-19.

74.     Moreover, the Independence plant manufactures specialty treats for dogs. Providing treats to dogs is not an essential service.

### F.     COVID-19 Spreads Through Tyson Fresh Meats' Waterloo Plant

75.     The Waterloo, Iowa facility is Tyson Fresh Meats' largest pork plant. It can process 19,500 hogs per day, accounting for 3.9% of the U.S. pork processing capacity.

76.     More than 2,700 people work at the Tyson plant in Waterloo, Iowa.

77.     For its part, Tyson began focusing on COVID-19 on or about January 2020. At that time, Tyson created a coronavirus task force.

78.     On information and belief, the task force allowed Tyson to closely understand COVID-19 and how the disease may impact its meat operations.

79.     On information and belief, by late-March, the Defendants knew or reasonably believed that COVID-19 was spreading within the Waterloo Plant.

80.     The Defendants knew that contracting COVID-19 could result in death.

81.     Notwithstanding its knowledge of COVID-19, including that the disease could spread easily in processing plants such as Waterloo, Tyson failed to protect its workers from the virus or properly communicate the impact of the virus on the Waterloo plant.

82.     For example, Tyson Foods did not provide its workers at the Waterloo plant with sufficient face coverings or other personal protective equipment (PPE).

83.     Nor did it implement or enforce sufficient social distancing measures at the plant.

84.     On or about April 6, 2020, Tyson temporarily shut down operations at its plant in Columbus Junction, Iowa, after two employees tested positive for COVID-19. As a result of the shutdown, a number of the hogs from Columbus Junction were transferred to Waterloo for processing there.

85.     Also on or about April 6, 2020, Tyson installed temperature checks to scan employees entering the Waterloo facility for a fever. Tyson knew or should have known that these temperature checks did not work as they were supposed to. For example, employees would routinely have the exact same temperature read each day even when their temperature varied.

86.     Moreover, none of the Defendants excused subcontractors and other visitors (such as truck drivers) from having their temperatures checked before entering the Plant.

87.     By late-March or early April, Defendants who were based out of the Waterloo Plant began avoiding the plant for the purpose of avoiding exposure to the coronavirus. Consequently, as the virus spread through the plant, these Defendants failed to ensure workers' safety and instead relied on low-level employees with no management experience or training to perform their supervisory responsibilities. During this time, and on information and belief, these Defendants cancelled regularly scheduled safety meetings.

88.     On information and belief, after learning that COVID-19 was spreading throughout the Waterloo Plant, the Defendants based out of the Waterloo Plant: (i) directed others to deny knowledge of COVID-19 cases at the Plant; (ii)

falsely denied the existence of positive COVID-19 cases at the Plant; (iii) told workers they would be notified if they had been in close contact with a COVID-19-positive employee.

89.     Black Hawk County Sheriff Tony Thompson and other Black Hawk health officials toured the plant on April 10, 2020.

90.     Thompson and the health officials were initially satisfied with Tyson's efforts after a meeting with management. But when they toured the facility, according to Sheriff Thompson, they saw workers using bandanas and sleep masks as masks, and some using no masks at all. There was no provision of PPE from corporate or plant management and no guidance on how to use PPE. They also saw little evidence of social distancing.

91.     By that point, Tyson acknowledged that they had at least three employees who had tested positive for COVID-19. As Sheriff Thompson asked: "Why on earth would they not be taking greater measures if what they're telling is true, that their greatest focus is on their employee safety?"

92.     In fact, Sheriff Thompson said that what he saw when he toured the plant "shook [him] to the core."

93.     Between April 9 and April 18, the number of positive COVID-19 cases in Black Hawk County surged by nearly 900%—from 20 cases to 192 cases. Local officials attributed 90% of the outbreak to the Tyson plant in Waterloo.

94.     Local officials urged Tyson to shut down the Waterloo plant, but Tyson denied that there was a COVID outbreak and refused to shut down.

95.     On April 12, 2020, on information and belief, nearly two-dozen Tyson employees were admitted to the emergency room at MercyOne Waterloo Medical Center.

96.     On April 14, Black Hawk County officials asked Tyson to temporarily shut down the Waterloo Plant because coronavirus was spreading there and creating a health hazard. The company refused.

97.     Instead of closing the plant, Tyson encouraged its workforce to continue coming in, offering a $500 bonus to anyone who showed up for every shift for three months.

98.     On April 16, 2020, Tyson company officials publicly denied a COVID-19 outbreak at the Waterloo Plant.

99.     On April 17, 2020, local officials warned Tyson that an "outbreak at a facility of your size puts great risk to the safety and well-being [of] all residents in our community, especially the elderly and vulnerable." Writing to Tyson, the local officials asked Tyson to voluntarily cease operations on a temporary basis, and implored the company to protect its workers from the deadly virus. In short, the letter put Tyson on notice that its factory conditions were putting employees at significant risk of contracting the virus.

100.    On or about April 19, Iowa state lawmakers filed an OSHA complaint against Tyson Foods after Waterloo employees complained of unsafe working conditions amid the coronavirus pandemic.

101.    Similarly, on April 21, Black Hawk County Board of Health issued a statement to Tyson recommending that the plant temporarily suspend operations.

102.    On information and belief, Tyson also permitted or encouraged sick and symptomatic employees as well as asymptomatic employees known or suspected to have been exposed to COVID-19 to continue working at the Waterloo plant. For example, a worker who had vomited on the production line was permitted to continue to work and return to work the next day.

103.    On information and belief, the Defendants based out of the Waterloo Plant ordered sick employees who had received a COVID-19 test to work while they were awaiting their test results.

104.    Defendant John Casey told employees of the Waterloo Plant to ignore symptoms of COVID-19 and to continue working. He told supervisors to continue working and instruct their direct reports to continue working, even if the individual had symptoms of COVID-19.

105.    On information and belief, Defendant Tom Hart organized a betting pool for supervisors and managers to wager how many employees would test positive for COVID-19.

106.    Similarly, on information and belief, Tyson transferred workers from the Columbus Junction plant (which closed due a COVID-19 outbreak) to the Waterloo plant without testing or quarantining those employees.

107.    Worse yet, on information and belief, Tyson denied that there was a COVID-19 outbreak at the Waterloo, instead either telling employees nothing or that a worker must have had the flu, when Tyson knew otherwise.

108.    Finally, on April 22, 2020, Tyson closed the Waterloo Plant.

109.    According to the Waterloo Mayor, the closure came "too late."

110.    Indeed, days before, on April 19, 2020, James Orvis died of COVID-19. He had contracted the virus only days earlier.

111.    By mid-April, Black Hawk County had the single largest outbreak of COVID-19 in Iowa. County officials attributed Tyson as the source of the new cases.[5] As of October 29, 2020, Black Hawk County has 6,646 confirmed cases, 4,511 recovered cases, and 102 deaths.

### G.    COVID-19 Spreads Through Tyson Pet Products' Independence Plant and the Surrounding Town.

112.    The Tyson plant in Independence, Iowa manufactures dog treats.

113.    There are approximately 250 people that work in Tyson's Pet Products Plant, in various capacities.

114.    Although Tyson's plant manufactures dog treats, Tyson claimed that it was critical infrastructure and essential to the nation's food supply.

115.    As a result, the Pet Products plant stayed open even after the Governor issued her order closing non-essential businesses on March 26, 2020. Perhaps sensing the tenuous nature of its claim that manufacturing dog treats was

---

[5] https://wcfcourier.com/news/local/covid-19-cases-jump-in-iowa-black-hawk-county/article_ac50533f-9712-59bd-be6f-55f24e060131.html

essential, employees were given a letter to carry with them indicating that their work was essential.

116.    Like in Waterloo, Tyson utterly failed to protect its employees in the Tyson Pet Products plant from COVID-19 despite knowledge of the deadly disease.

117.    When employees raised concerns about the conditions at the Independence Plant, they were met with resistance. For example, one employee who called human resources asking whether it was safe to work was falsely told that he had a better chance of getting COVID-19 shopping at Walmart than going to work.

118.    Nonetheless, the measures that were implemented were dangerously inadequate.

119.    For example, Tyson Pet Products publicly stated that it was implementing social distancing, but there remained many areas where employees were less than six feet apart, including in locker rooms, the gear and equipment checkout, and the cafeteria. In addition, even where employees were supposed to be working six feet apart, which they were not, they were separated only by clear, flimsy garbage bags, which offered no protection from the spread of the virus.

120.    Tyson Pet Products refused to provide plexiglass barriers when employees were not six feet apart or to slow the production line to ensure safe social distancing.

121.    In addition, Tyson said that it was requiring employees at its Pet Products Plant to wear masks, but those masks were not consistently provided, nor were steps implemented to ensure that they were consistently or properly worn.

122. Tyson Pet Products also did not increase cleaning or sanitizing at the Pet Products Plant, notwithstanding that such increased cleaning and sanitizing was part of the CDC guidelines.

123. Tyson Pet Products started taking the temperature of its employees, but those thermometers did not work or were not being used properly. As one employee explained, her temperature was "94 degrees every day. It's not very accurate. Everybody knows that." Moreover, employees were let in to the plant even when their temperatures were over 100 degrees.

124. Finally, just as was true in Waterloo, employees at Tyson's Pet Products plant were told that if they shared information about who was sick or who had the virus with other employees or learned who was warning co-workers about possible cases at the Pet Products Plant, those employees would be fired. This was particularly concerning because employees were only learning about suspected or confirmed COVID-19 cases from their co-workers.

125. In fact, Tyson's Independence plant remains open, even as coronavirus spreads through the facility and surrounding town, and despite that manufacturing treats for dogs is not an essential service.

## H. Tyson Fails To Implement Necessary Precautions To Protect Workers From Coronavirus

126. The spread of coronavirus could have been slowed significantly if employers had adhered to the CDC and OSHA Guidelines.

127. Debbie Berkowitz, a former senior OSHA official said: "This all could have been prevented. Workers are paying with their lives and their health because

their industry decided not to implement basic safety precautions and OSHA decided to bury its head in the sand and tell workers 'You're on your own.'"

128.    But Tyson did not follow the CDC's or OSHA's Guidelines. It failed to take necessary steps to protect workers from contracting COVID-19, even though it knew the disease was spreading throughout its plants.

129.    Indeed, there were more than two dozen complaints lodged against Tyson, including allegations of the following:

i.    There was no clear communication about when workers became ill with COVID-19.
ii.    Workers were getting in trouble for warning others about possible exposure, a particularly concerning form of retaliation given the fact that Tyson was not properly conducting contact tracing or alerting employees to possible COVID-19 cases in the plant;
iii.    Employees were told to continue to work, even when sick. For example, even when an employee had a temperature of 99 or 100, they were told they were safe to work;
iv.    Employees were not provided with masks by Tyson; instead, they were told to get their own; and
v.    There was no guidance to employees about what to do if they tested positive. In fact, employees reported that even once they tested positive, they were required to bring in a doctor's note proving the same or they would be fired.

130.    There were also numerous complaints about working conditions at the Pet Products Plant, similar to those identified about the Waterloo plant above.

131.    At the Waterloo plant, workers who were experiencing symptoms consistent with COVID-19, including fever, runny nose, headache, and other symptoms, were told that they had to continue working unless and until they produced a doctor's note showing a positive result from a COVID-19 test.

132. That same rule was imposed on workers who were living with a known-positive COVID-19 case, even though the workers had been exposed to the disease and were likely carriers.

133. Defendants did not provide masks or other protective equipment to their employees. Nor did they in practice require workers to wear masks brought from home.

134. Defendants began offering a COVID-19 test but it was actually a test for antibodies, which would be produced only after an infected person was able to fight off the illness, not during the illness itself. Moreover, the test was extremely difficult to access. Employees had to wait in a line spanning the length of a 1,500-car parking lot, standing close together for hours without masks or adequate space between persons, similar to the line depicted in this photo:



135. Defendants eventually began taking the temperature of employees but not all employees were tested, and the process of doing so itself spread germs among employees because appropriate safety protocols were not used.

136. In response to a deadly and highly contagious virus, Defendants failed to take even the most minimal steps to protect their employees, such as spacing them out at least six feet, requiring facial coverings, and increasing hygiene and sanitation. Tyson could have easily implemented these steps. For instance, it could have slowed down the speed of its processing lines to require fewer workers per shift.

137. Not only did Defendants fail to take any precautions to protect its employees, they discouraged them from protecting themselves in several ways. For instance, Defendants reduced workers' already accrued vacation time when the pandemic became apparent, so that these employees did not have enough time to take off and avoid coming to work. Moreover, Defendants did not disclose which workers had tested positive or were self-quarantining or otherwise alert employees who had been in contact with the infected worker that they may be at risk.

138. Defendants' workers, and the communities in which these plants exist, have suffered greatly as a result of Defendants' misconduct.

## I. Tyson's Lobbying

139. Instead of spending its time and effort protecting its employees, Tyson used its time and resources to lobby for legal immunity should its workers

inevitably get ill—a near certainty given Tyson's failure to follow the guidelines promulgated by OSHA and the CDC.

140.    Tyson built its public campaign on a falsehood: that Americans' meat supply was at risk of drying up. Tyson alarmed the public by predicting that "millions of pounds of meat will disappear" from the nation's supply chain as plants were being forced to close because of outbreaks.[6] But that same month, Tyson exported 1,289 tons of pork to China—its largest single month total in more than three years.[7]

141.    On information and belief, Tyson executives lobbied or directed others to lobby members of Congress for COVID-19 related liability protections.

142.    On information and belief, Tyson executives lobbied or directed others to lobby Governor Reynolds for the same type of protection. Tyson executives also lobbied Governor Reynolds, or had others lobby for them, so that only the state government—and not local governments—had the authority to close businesses in Iowa, including the Tyson facilities.

143.    For example, in late April, Governor Reynolds held a conference call with the CEO and other high-ranking officials at Tyson, along with Tyson's lobbyist, Matt Eide. During that call, Tyson downplayed the extent of the COVID-19 outbreak at the Waterloo plant and exaggerated the safety measures put into place at their facilities.

---

[6] https://www.nytimes.com/2020/06/16/business/meat-industry-china-pork.html
[7] *Id.*

144.    After Tyson closed the Waterloo plant, on or about April 26, 2020, Tyson placed a full-page advertisement in the *New York Times*, *Washington Post* and *Arkansas Democrat-Gazette*. In the advertisement, Tyson asserted that "the food supply chain is breaking" and that if plants close, "millions of pounds of meat will disappear from the supply chain" and "[a]s a result, there will be limited supply of our products available in grocery stores until we are able to reopen our facilities that are currently closed." The advertisement stressed that Tyson "ha[s] a responsibility to feed our country" that is "as essential as healthcare."

**Plaintiff James Orvis' Death**

145.    As described above, James Orvis was an employee at the Tyson Waterloo plant.

146.    Mr. Orvis was a loving uncle, brother and friend to many. He had been working for Tyson for 18 years before he passed away from COVID.

147.    During his nearly two decades with Tyson, Mr. Orvis had a number of jobs. Most recently and at the time of his death, Mr. Orvis worked in the laundry department at the Waterloo plant.

148.    On April 12, 2020, Mr. Orvis started feeling sick. He was diagnosed with COVID-19. Within days of feeling ill, he was hospitalized and placed on a ventilator.

149.    On April 19, 2020, Mr. Orvis died of COVID-19.

**Plaintiff Arthur Scott's Death**

150.    Plaintiff Arthur Scott was a loving brother, uncle, and father to his children.

151.    He worked at the Tyson Pet Products plant in Independence, Iowa.

152.    Mr. Scott became ill and was diagnosed with COVID-19. After a several-day battle with COVID-19, on April 23, 2020, Mr. Scott succumbed to the deadly virus.

## CLAIMS

### COUNT I
### Gross Negligence

153.    Plaintiffs incorporate by reference their allegations in Paragraphs 1 through 135, as though fully set forth herein.

154.    At all relevant times, Defendants knew that COVID-19 was a highly contagious, potentially fatal, serious disease that was spreading rapidly in Iowa.

155.    At all relevant times, Defendants knew that unless they implemented necessary health and safety measures including physical distancing, providing realistic opportunities for hand washing, requiring protective facial masks, and requiring isolation of individuals exposed to or symptomatic of COVID-19, their employees were likely to be exposed to the coronavirus while working inside the plant.

156.    Defendants had a duty to prevent injuries to their employees, including Mr. Simmons and Mr. Orvis, as set forth in Iowa Code §85.20(2).

157.    Defendants knew that exposure to coronavirus would likely result in contracting COVID-19, a serious disease.

158. Yet Defendants were grossly negligent in their response to the threat of COVID-19 by failing to take sufficient measures to protect their employees from it.

159. Defendants chose not to follow the CDC and OSHA guidelines or to implement the health and safety protocols necessary to stem the spread of coronavirus among their employees. In this way, Defendants disregarded a known and/or obvious risk. Defendants acted with wanton neglect for the safety of its employees.

160. Among other failures, the Defendants:

    i. Failed to implement an effective health screening and monitoring of employees, including a program to effectively screen employees before they entered the workplace; criteria and procedures for sick or symptomatic patients; and criteria and procedures for the safe return to work for employees infected with or exposed to COVID-19;

    ii. Failed to implement and promote social distancing, including physical barriers to separate workers from each other and slowing the production line;

    iii. Failed to improve the ventilation to better protect workers;

    iv. Failed to implement appropriate cleaning, sanitation and disinfection practices;

    v. Failed to provide employees with appropriate PPE and mandate the proper use of PPE;

    vi. Failed to implement a testing and contact tracing protocol;

    vii. Failed to train workers and supervisors on how to reduce their exposure to and prevent the spread of COVID-19;

viii. Failed to inform employees when they had close contact with another person with a confirmed or suspected case of COVID-19;

ix. Failed to implement appropriate sick leave or attendance policies;

x. Made false and fraudulent misrepresentations on behalf of Tyson as set forth below;

xi. Failed to maintain a safe working environment;

xii. Failed to take reasonable precautions to protect workers from foreseeable dangers;

xiii. Failed to adhere to local, state and federal rules, regulations and guidance;

xiv. Failed to adhere to OSHA and CDC standards, directives and guidance.

161. Those failures were grossly negligent, amounting to such lack of care as to constitute wanton neglect for the safety of their employees.

162. As a direct result of Defendants' conduct, Plaintiffs sustained physical and emotional harm.

## PRAYER FOR RELIEF

163. Plaintiff Levita Simmons, as Administrator of the Estate of Arthur Scott, seeks recovery from Defendants for all damages cognizable under Iowa law including but not limited to:

a) Arthur Scott's pre-death physical and mental pain and suffering;

b) Arthur Scott's pre-death loss of function of the mind and body;

c) Arthur Scott's pre-death fright and emotional distress;

d) Arthur Scott's pre-death medical expenses;

e) Pecuniary loss of accumulation to the Estate of Arthur Scott;

f) Interest on premature burial expenses; and

g) Past and future loss of the love, services, society, companionship, support, affection, and consortium suffered by his children as a result of the death of their father.

164. Plaintiff Jeffrey Orvis, as Executor of the Estate of James Orvis, seeks recovery from Defendants for all damages cognizable under Iowa law including but not limited to:

a) James Orvis's pre-death physical and mental pain and suffering;

b) James Orvis's pre-death loss of function of the mind and body;

c) James Orvis's pre-death fright and emotional distress;

d) James Orvis's pre-death medical expenses;

e) Pecuniary loss of accumulation to the Estate of James Orvis; and

f) Interest on premature burial expenses.

Plaintiffs respectfully ask this Court to enter judgment against the Defendants and award:

(i) Economic damages in an amount consistent with the allegations in the Petition and proof at trial;

(ii) Non-economic damages in an amount consistent with the allegations in the Petition and proof at trial;

(iii) Punitive damages in an amount sufficient to punish the Defendants for this egregious, life-threatening misconduct and to deter similar misconduct in the future;

(iv) Costs, interest and all other relief to which the Plaintiffs are entitled by law or equity.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all claims so triable.

RESPECTFULLY SUBMITTED,

**LEVITTA SIMMONS AND JEFFREY ORVIS**

Respectfully submitted,

  /s/ EA Araguas
Elizabeth Araguas, AT0011785
**NIDEY ERDAHL MEIER &
ARAGUÁS, PLC**
425 2nd Street SE, Suite 1000
Cedar Rapids, IA 52401
(319) 369-0000 (telephone)
(319) 369-6972 (facsimile)
earaguas@eiowalaw.com (e-mail)

**ATTORNEY FOR PETITIONER**

Jon Loevy (jon@loevy.com)
Gayle Horn (gayle@loevy.com)
Roshna Bala Keen (roshna@loevy.com)
Mark Loevy-Reyes (mark@loevy.com)
Katie Roche (katie@loevy.com)
LOEVY & LOEVY
311 N. Aberdeen
Chicago, Illinois 60607
(773) 558-5898 telephone
(312) 243-5902 fax